## SNOW v. NELSON.

(Circuit Court, D. Nevada. January 20, 1902.)

### No. 704.

1. MINES—CONTRACTS OF SALE—TIME OF PAYMENT—ESSENCE OF CONTRACT—WRITTEN MEMORANDUM—STATUTE OF FRAUDS.

Where the written memorandum of an oral contract of sale of mining property is not certain as to the time when the first payment is to be made, it is insufficient to take the contract out of the statute of frauds, time being of the essence of contracts relating to such properties.

2. SAME—CHANGE OF TERMS OF THE MEMORANDUM.

Where a written memorandum is made of an oral contract for the sale of real property, and the terms of the contract are afterwards changed by oral agreement of the parties, the whole thereupon becomes an oral contract.

3. SAME—OPTION TO PURCHASE—WHEN NOT ASSIGNABLE.

Where an option, not assignable in terms, to purchase mining property, is given to one who represents himself to be the agent and acting for a party known to the owner, and to whom he desires to sell, such option is not assignable.

4. SAME—WITHDRAWAL OF OPTION.

Where a mine owner gives an option to purchase his mines, he may withdraw such option at any time before its acceptance.

Trenmor Coffin and James A. Williams, for plaintiff.
M. S. Bonnifield and Wm. H. King, for defendant.

HAWLEY, District Judge (orally). This is a suit for the specific enforcement of a contract for the sale of certain copper mining claims situate in Humboldt county, Nev. It is, among other things, alleged in the amended bill of complaint: That on May 15, 1899, one W. H. Edwards entered into an oral or verbal agreement with the defendant J. A. Nelson for the purchase of certain mining claims for the sum of $12,000,—$200 to be paid by Edwards to Nelson upon the execution and delivery by Nelson of a bond and lease for said claims to Edwards and upon the execution and delivery by Nelson of a deed for the claims, delivered into escrow, $800 six months from said date, and $11,000 within fifteen months from said date. That said Edwards agreed to do the unfinished location work on

said claims as provided by the laws of the state of Nevada. That afterward Nelson agreed to do said unfinished location work for $175. That a deed was to be executed and placed in escrow and delivered to Edwards or his assigns upon the final payment of said $12,000. That pursuant to said agreement defendant Nelson made, executed, and delivered to Edwards the following memorandum thereof, to wit:

"Jackson Creek, Humboldt County, Nev., May 15th, 1899.

"This is to certify that I, J. A. Nelson, do hereby agree to lease and bond to W. H. Edwards the following described mining claims: The 'Olympia,' the 'Humboldt,' the 'Tiger,' the 'Alta,' the 'Grand,' the 'Deer Spring,' the 'Lucky,' the 'Crown Point,' all situated in the Jackson Mountains, on the north side of Jackson Creek canyon; also three claims in Black Rock Mountains, namely, the 'Copper Nugget,' the 'Crescent,' the 'Black Jack,' all three situated in Humboldt county, north of Battle creek,—for the sum of $12,-000.00; two hundred dollars cash when the lease and bond is accepted and the deed is put in escrow, eight hundred dollars in six months from date, the balance within fifteen months from date. All location work to be done by J. A. Nelson, and recorded with the records at the recorder's office, in Winnemucca, Nevada; the unfinished location work to be done by me, W. H. Edwards, providing the company accepts the proposition in proper time.

"J. A. Nelson.

"Witness: P. M. O'Brien."

That the proof of the acknowledgment of said memorandum was thereafter duly made, and the said memorandum was on the 21st day of May duly recorded in the recorder's office of Humboldt county. That the proviso contained in the last two lines of said agreement referred to James A. Williams, Charles Dupont, and J. W. Langley, said Edwards' associates at Salt Lake City, and furnishing him money for expenses on a certain mining venture in the state of Nevada. That the said associates accepted the proposition immediately, and confirmed the making of the said contract by Edwards. That Williams, Dupont, and Langley duly assigned and released to the plaintiff all their right, title, and interest in said contract and in all the property therein described before the bringing of this suit, and the plaintiff is now the owner and holder thereof. The written memorandum is not the contract, but it is evidence of it. No lease, bond, or deed was ever executed by the defendant.

Is the alleged contract enforceable? Is the written memorandum signed by Nelson sufficient to take the case out of the statute of frauds of this state (sections 2696, 2700, Cutting's Comp. Ann. Laws)? The law requires that the note or memorandum must contain the essentials of the contract as completed. Browne, St. Frauds, § 371a; Pom. Cont. § 86. It must contain the terms of the contract, and must be so reasonable, certain, and definite in itself that the contract can be made out without requiring additional proof in parol. 1 Reed, St. Frauds, § 392. It must "contain such words as will enable the court, without danger of mistake, to declare the meaning of the parties. It must obviate the necessity of going to oral testimony and relying on treacherous memory as to what the contract itself was." Scarritt v. Episcopal Church, 7 Mo. App. 174, 178. It must appear that there was a "clear accession on both

sides to one and the same set of terms," that the minds of the parties met at every point, and that nothing was left open for future arrangement. Langellier v. Schaefer, 36 Minn. 361, 31 N. W. 690; Krum v. Chamberlain, 57 Neb. 220, 77 N. W. 665. The general proposition as to the form of such memoranda is expressed in Wood, Frauds, § 345, as follows:

"If the memorandum contains all the essential elements of a contract, the form in which it is written is of no account, as any instrument, however informal, or bunglingly constructed, which describes the property, the price to be paid therefor, if the price has been agreed upon, the parties, and the essential terms of the agreement, either by its own terms or by reference to other writings, so that parol evidence is not necessary to establish or explain it, is as valid and binding as the most formal instrument which could be constructed. The statute only contemplates that such a note or memorandum should be made as men in the hurry of business may be supposed to be likely to make; but, nevertheless, of such a definite character in all the essentials of the contract that the intention of the parties, their names, and relation to each other under the contract, can be gathered from the memorandum itself, leaving nothing to be supplied by parol. But a memorandum which is deficient in any of these respects is insufficient to take the contract out of the statute."

See, also, Browne, St. Frauds (4th Ed.) §§ 345a, 371, 371a.

The alleged oral contract in the present case relates to an option for the purchase of mining property, whereby the party obtaining the option seeks to secure the first privilege of purchasing the same within a given time upon complying with certain terms embodied therein. There are a number of people, generally known and designated as "promoters," who travel through the mining regions for the purpose of obtaining such options from the owners of a mine, and "trust to luck" to be able to market the same in the money centers of the world. Others often represent moneyed men who have furnished sufficient means to enable their agents to obtain such options, agreeing to furnish the money for the purchase, provided an examination and inspection of the property prove it to be of sufficient value to warrant the purchase. In the very nature of such cases the courts ought always, in order to prevent fraud, deception, or misstatement, where the contract is not in writing, to require that the note or memorandum which is relied upon to take the contract out of the statute of frauds should be reasonably clear, definite, and certain. The written memorandum contains several of the essentials required by the statute. It describes the property; the price agreed upon to be paid therefor. It is signed by the party to be charged thereby. But the time when the first payment is to be made is not clear and certain. The date is not fixed. It might, however, be held that the law would imply that it should be within a reasonable time. If so, the mere failure to name the date would not of itself prevent the enforcement. The authorities upon this point are by no means uniform. The discrepancies which exist may, to some extent, be attributable to the different kinds of contracts. The question is elaborately discussed in Pom. Cont. §§ 374, 387, 388, one group of decisions holding that, with reference to unilateral contracts, time is, and necessarily must be, essential in the strict sense of the term; while another group holds that time is merely mate-

rial, but not absolutely essential. The authorities generally declare that, where mines or mining properties are the subject of the contract, time is of the essence. In 2 Lindl. Mines, p. IIII, § 859, the author says:

"The necessity for a strict adherence to the rule that in all contracts for the purchase of mines time is of the essence is apparent. Were the rule to be relaxed, and the owner of the mine executing the option or contract of sale, which is ordinarily unilateral, and not mutual, to be compelled to resort to the courts to terminate the equities of the proposed vendor, or remain in a state of uncertainty awaiting the lapse of an indefinite period called 'reasonable time,' his property would remain practically unmarketable. The holder of the option would be given unreasonable opportunities to speculate without the fear of incurring any loss. The law would place him in a position to interdict a sale to any one else, or to exact an unearned consideration for a surrender of phantom equities."

The written memorandum is in many other respects so uncertain and indefinite in its terms as to require oral testimony to explain it in order to enable the court, "without danger of mistake," to judicially determine its true intent and meaning. In Pom. Cont. § 71, the author, speaking of the statute of frauds, says:

"The controlling motive of the statute is one of expediency and convenience, and this motive has always been kept in view by the ablest courts in their work of interpretation. As its primary object is to prevent mistakes, frauds, and perjuries by substituting written for oral evidence in the most important classes of contracts, the courts of equity have established the principle, which they apply under various circumstances, that it shall not be used as an instrument for the accomplishment of fraudulent purposes. Designed to prevent fraud, it shall not be permitted to work fraud. This principle lies at the basis of the doctrine concerning part performance, but is also enforced wherever it is necessary to secure equitable results."

Acting under these general principles, the courts have held that, if the plaintiff's conduct in obtaining an option or contract, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith, a court of equity will refuse him the remedy of a specific performance. Pom. Eq. Jur. § 400.

Specific performance is not a matter of absolute right, but rests entirely in judicial discretion, to be exercised according to the settled principles of equity so as to reach the ends of justice. Newton v. Wooley (C. C.) 105 Fed. 541, 544; and authorities there cited. The memorandum signed by Nelson agrees "to lease and bond" to Edwards the mining claims therein described, "providing the company accepts the proposition in proper time." But this last clause is claimed by plaintiff to have been inserted for the purpose and intention that it should be applied only to the assessment work that was to be done upon the mines, and has no application to the agreement of sale. By a literal reading of the last clause it would seem to apply only to the unfinished assessment work to be done in order to secure a title to the mines, but Edwards was to do this work "providing the company accepts the proposition in proper time." There is no pretense in the pleadings or evidence that Edwards did any of the location work. On the contrary, the complaint alleges and the proofs show that after the execution of the written memorandum the agreement as to this work was orally changed, and that Nelson agreed to do said unfinished work "at an agreed

price of $175." The proofs show that neither Edwards nor the plaintiff ever paid or tendered to Nelson the sum of $175, or any sum of money whatever, for location work. It is evident that it was essential that the location work should be done either by Nelson or Edwards within the time allowed by law. The proofs show that Nelson had, prior to that time, done the location work on some, but not all, of the claims, and that upon several of the claims the assessment work was never done, and they have since been relocated by other parties. The testimony shows that Williams, Dupont, and Langley, who it is alleged were Edwards' associates, "furnishing him money for expenses," never accepted the proposition in "proper time," or at any time, but as a matter of fact declined to act in the premises.

Conceding that the last clause in the memorandum only applied to the location work, the question remains whether it was not an essential part of the memorandum? Would Nelson have signed it if that clause had been left out? If the bars are thrown down, and the court compelled to examine all the oral testimony, it clearly appears that he would not. But of that more anon. Does not the fact alleged in the complaint that Nelson and Edwards afterwards orally agreed to change its terms in such a manner as to depart from the writing signed by Nelson reduce the agreement between the parties to the level of a verbal contract, which cannot be enforced? In Bish. Cont. § 164, the author says:

"A contract partly in writing and partly oral is, in legal effect, an oral contract. It occurs where an incomplete writing, or one expressing only a part of what is meant, is by oral words rounded into the full contract; or where there is first a written contract, and afterward it is changed orally."

In the last line of the memorandum it speaks of the "company." What company? The name of the company is not stated. Nor are the names of the individuals comprising the company disclosed. It is difficult to separate one part of the memorandum from the other. There was but one memorandum. It must be construed in its entirety. The last clause sheds some light on the whole transaction. It indicates that Edwards was not acting for himself alone. It requires oral testimony to show who the company was, and the testimony upon this point is nearly as uncertain as the written note or memorandum. On one side the testimony is to the effect that Williams, Dupont, and Langley were to be equally interested with Edwards; on the other side it is claimed that it was Judge Burton's contract because he put up the money to pay Edwards' expenses. There is a decided conflict in the evidence upon all material points. Was the contract, if such it can be called, assignable? The weight and reliability of the oral testimony shows that Edwards misrepresented the facts and concealed the truth as to the parties for whom he was acting, and thereby induced Nelson to sign the memorandum and enter into a contract. He represented that he was acting for McCornick & Co., bankers at Salt Lake, whom Nelson knew to be responsible, and possessed of large means. Nelson testified that he owned other mining claims in the vicinity of those mentioned in the written memorandum, and that he wanted to dis-

pose of those mentioned to parties who had the means to work and would develop the same, believing that it would increase the value of his other claims; that he stated this fact to Edwards, and that Edwards then made the statement that he was representing McCornick & Co.; that Nelson believed such statement to be true, and would not have signed the memorandum if he had not believed these representations made by Edwards. The law is well settled that contracts of this character, entered into by one party upon the representations of the other as to the responsibility and solvency of the other party or parties, are not assignable. 2 Am. & Eng. Enc. Law (2d Ed.) 1037, and authorities there cited. In Arkansas Val. Smelting Co. v. Belden Min. Co., 127 U. S. 379, 387, 8 Sup. Ct. 1308, 1309, 32 L. Ed. 246, 248, the court said:

"Every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of Lord Denman, 'You have the right to the benefit you anticipate from the character, credit, and substance of the party with whom you contract.' Humble v. Hunter, 12 Q. B. 310, 317; Winchester v. Howard, 97 Mass. 303, 305, 93 Am. Dec. 93; Ice Co. v. Potter, 123 Mass. 28, 25 Am. Rep. 9; King v. Batterson, 13 R. I. 117, 120, 43 Am. Rep. 13; Lansden v. McCarthy, 45 Mo. 106. The rule upon this subject, as applicable to the case at bar, is well expressed in a recent English treatise: 'Rights arising out of contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided.' Pol. Cont. (4th Ed.) 425.'"

Section 3100, Cutting's Comp. Ann. Laws, relied upon by plaintiff, does not change the rule as to the assignability of such contracts. The statute does not enlarge the right of assignment, nor authorize it "in cases where it did not before exist." 7 Enc. Pl. & Prac. 757, and authorities there cited; Pom. Rem. & Rem. Rights, 145; Wheeler v. Walton & Whann Co. (C. C.) 64 Fed. 664, 667. The option had no binding force until it was accepted in compliance with its terms. Pom. Cont. §§ 59, 60; Hackley v. Oakford, 39 C. C. A. 284, 98 Fed. 781; Weaver v. Burr, 31 W. Va. 736, 8 S. E. 743, 3 L. R. A. 94; Erickson v. Wallace, 45 Kan. 430, 432, 25 Pac. 898. The oral testimony satisfactorily shows that Nelson, after he signed the memorandum, upon learning that Edwards had misrepresented the facts as to McCornick & Co. being the parties for whom he was acting, and before there was any acceptance by the company, repudiated the contract, and declined to have anything more to do with Edwards, and, among other things, accused Edwards of having deceived him and lied to him, etc. Nelson, under the facts of this case, had the unquestioned right, before any valid acceptance, to withdraw the offer. In Pom. Cont. § 61, the author said:

"As the offer is not in any sense binding, the person who makes it may, at any time before a valid acceptance has changed its character, withdraw it, and thus put an end to the negotiation. He can do this whatever be its form, whether promissory or not, and without any reason except his own will. Although the person to whom the offer was made may have intended, and even attempted, to accept, still if the acceptance was for any reason imperfect, and not binding, so that no contract was concluded, the power of withdrawal remains unaffected."

The record shows that the plaintiff bought the interest of the parties under whom he claims with full knowledge of all the facts and of all the equities in the premises, and is, of course, bound by them.

With reference to the question of part performance, relied upon by plaintiff, it is enough to say that, in my opinion, there is no sufficient evidence of any such part performance by plaintiff, or of any of the parties under whom he claims, as would justify this court to decree a specific performance on this ground.

The views I have expressed are conclusive that plaintiff has failed to make out such a case as entitles him to any decree. It is therefore unnecessary to consider any of the other questions discussed by counsel.

The defendant is entitled to a judgment for his costs. Let a decree be entered accordingly.