### DEMAREST v. DUNTON LUMBER CO.

(Circuit Court, S. D. New York. February 21, 1907.)

1. SALE—CONTRACT FOR FUTURE DELIVERIES—WAIVER OF DEFAULTS.

Where a contract for the sale and delivery of lumber by a lumber company required it to ship from time to time as ordered by the purchaser, and the purchaser to pay for each invoice within 10 days after its shipment, but neither requirement was strictly complied with, and no ob-

---

* For opinion of Circuit Court of Appeals, see 121 Fed. 69.

jection was made to such noncompliance by either party, there was a waiver of such conditions as to past orders or shipments, and the seller, which had made shipments, while the purchaser was in default on payments, could not refuse to make further shipments because of such past defaults, although it had the right to insist on payment for the last shipment, which had not been waived, within 10 days, as a condition to further shipments, and was not chargeable with a breach of the contract in refusing to make further shipments until such payment was made or tendered.

2. SAME—ASSIGNMENT OF CONTRACT—ACTION BY ASSIGNEE FOR BREACH.

Where a contract for the sale and purchase of lumber to be shipped by the seller from time to time as ordered by the purchaser was assigned by the purchaser, but the seller at all times refused to recognize such assignment, and all parties thereafter treated it as a nullity, and the assignee as merely agent or representative of the purchaser, to whom all bills were rendered, the assignee cannot maintain an action against the seller to recover damages for breach of the contract.

3. SAME—CONSTRUCTION OF CONTRACT.

A contract for the sale and delivery by a lumber company of its entire cut of lumber for a specified year, except what it shall require for its retail trade at its mill, and which further provides that it is agreed that the cut for the year shall not be less than 2,000,000 feet, cannot be construed to require the delivery of 2,000,000 feet.

4. SAME—ASSIGNABILITY OF CONTRACT.

A contract by a lumber company to sell its cut of lumber for a certain year, except what it should require for its retail trade, such lumber to be delivered, properly dried, f. o. b. cars at its mill from time to time, consigned as directed by the purchaser, each shipment to be paid for within 10 days, and which further provided that the lumber retained by the company for its retail trade should not be above the average in quality, and that the lumber should be sawed as the buyer might direct and be of specified lengths, except that some should be taken of different lengths, necessarily involved some considerations of personal trust and confidence, and was not assignable by the purchaser without the seller's consent.

At Law. Motion to set aside verdict and for a new trial on the grounds that the verdict is contrary to and unsupported by the evidence: and that, if in any view plaintiff can maintain the action, the damages are excessive.

McKelvey & Mattocks, for plaintiff.

Rounds & Dillingham, for defendant.

RAY, District Judge. This action was brought by the above-named plaintiff, Charles R. Demarest, assignee of one Alfred Vanhorn, to recover the damages which Vanhorn claimed he sustained by the failure of the defendant, the Dunton Lumber Company, to perform a written contract made by it with W. E. Kelley & Co. for the sale and delivery of lumber to Kelley & Co.

(1) December 11, 1900, W. E. Kelley & Co., of Portland, Me., as party of the first part, entered into a written contract with the Dunton Lumber Company, of the same state, as party of the second part, whereby the first party agreed to buy of the second party, and the second party agreed to sell and deliver to the first party, its "entire cut of white pine lumber for the year 1901, except such lumber as the party of the second part shall have to use for his retail trade in the city of Rumford Falls," and the first party agreed to pay

therefor "the sum of $12.50 per thousand for the entire cut of the year 1901," as follows:

"Terms. Payment for the same shall be made by the party of the first part within ten days from date of invoice. The party of the first part having the right to discount the invoice one per cent. for cash payment."

As to deliveries the contract provided as follows:

"It is agreed that the lumber shall be ordered by the party of the first part and shipped when dry by the party of the second part consigned to the order of the party of the first part at such destination as they may name. All deliveries to be made by the party of the second part f. o. b. cars at Rumford Falls, Maine. Invoice for each shipment to be dated the day of such delivery."

The contract contained the following provisions also:

"The party of the second part agrees that the lumber used for his retail trade shall not be of the best contained in the logs from which the lumber shall be sawed, but will consist of lumber not better than the average grade."

"Conditions. Provided that said lumber shall be sawed by the party of the second part in such manner as the party of the first part may direct from time to time. The party of the second part agrees to saw the lumber as near as he can on even inches, the widths of which shall be 4", 6", 8", 10", and 12". Lumber wider than 12 inches may be any width. The lumber must be sawed inch, inch and one-fourth and inch and one-half, two inch or thicker, as the party of the first part may direct from time to time, and must be fair and full to the sizes given when dry. The party of the second part also agrees to have his logs cut twelve, fourteen and sixteen feet respectively, with at least sixty per cent. sixteen foot. It being agreed by the party of the first part that he will accept lumber shorter than twelve foot and some longer than sixteen foot. The poorest grade shall be sound, merchantable lumber, free from rot, and must be square edged. The narrowest width of lumber to be considered shall not be less than four inches wide, and the shortest lumber to be considered will not be less than eight feet long."

Also the following:

"The party of the second part agrees to have at least 500,000 feet in pile by the last day of June, 1901, and not less than 1,000,000 feet in pile by the 31st day of July, 1901. The balance of which must be put in pile as fast as can be done by the party of the second part."

Also the following, in connection with the last provision quoted:

"The party of the second part agrees that the amount of the year's cut will not be less than 2,000,000 feet, and as much more as the party of the second part can furnish."

(2) June 19, 1902, W. E. Kelley & Co., by an instrument in writing, assigned this contract, with others, to said Alfred Vanhorn, and agreed therein to loan him $2,000 to enable him to prosecute the business of shipping and selling the product of the contracts, and Vanhorn agreed—

"to hold sacred the proceeds of this business for the operating of same and the paying of these obligations,"

and further:

"It is understood and agreed that Alfred Vanhorn will prosecute with the utmost diligence the completion of these contracts and wind up this business at the earliest possible moment, and that he will not enter into any other contracts or enterprises which might prevent him from doing so, until the completion of this contract in all its features."

It was also provided in this assignment as follows:

"This contract becomes operative since the first day of April, 1902."

(3) Thereupon Kelley & Co. notified the Dunton Lumber Company of such assignment of such contract, but the Dunton Lumber Company expressly refused to assent to such assignment, or to recognize Vanhorn as the owner thereof, or to recognize him as a party or person entitled to demand or enforce its performance. Kelley & Co. thereupon wrote they would guaranty all payments for lumber delivered under the agreement, but the Dunton Lumber Company did not assent to the assignment even then, but gave notice it would only recognize and treat Vanhorn as agent and representative of Kelley & Co. Thereafter Vanhorn procured deliveries of lumber by selecting and having it loaded on the cars and invoiced to certain parties, but the Dunton Lumber Company persisted in its refusal to recognize the assignment, and persisted in treating Kelley & Co. as the principal, and in all cases made out the bills, etc., for the lumber to Kelley & Co., and sent them to that company, which retained them. Vanhorn, however, made payments on such bills or invoices, but the Dunton Lumber Company gave receipts to Kelley & Co. reciting that the money was received from Kelley & Co. "by the hand of A. Vanhorn." Shortly before July 28, 1902, Vanhorn, who was obtaining the lumber and doing the business for Kelley & Co., as that firm had informed the lumber company he would do, claimed to that company that the contract had been assigned to him, whereupon that company made inquiry by letter, and in reply Kelley & Co. said:

"We thought you had been notified that this contract had been transferred to Mr. Vanhorn. We wish to take this opportunity of so notifying you, if you have not already been so informed."

In reply the Dunton Lumber Company said:

"Gentlemen: Your favor with check for $22.55 received. We note what you say about the transfer of the contract to Mr. Vanhorn. As we do not know anything about Mr. Vanhorn or his financial ability, we shall still continue to charge what boards are shipped to W. E. Kelley & Co., as they are the only party that we know in this contract. If you wish to cancel the contract so far as you are concerned, that is another matter. We shall not accept any transfer to parties that we do not know, as we do not think it would be good, business judgment to do so. We are perfectly willing that Mr. Vanhorn should ship the lumber out as your agent or representative, and will help him all we can to get the lumber off quickly, but we must still hold W. E. Kelley & Co. responsible for the pay for the lumber, according to contract made to them."

In reply, W. E. Kelley & Co. said, August 9, 1902:

"Gentlemen: We have your favor of the 7th inst. We are satisfied with your wishes in the matter of completing the contract made with us for the lumber which we had turned over to Mr. Vanhorn. We will guarantee the payment of the shipments which you make on this contract."

But for the subsequent correspondence and transactions, this might be construed as an acceptance of and assent to the transfer to Vanhorn, with the guaranty of W. E. Kelley & Co. for all payments to come due under it. But the bills were made to Kelley & Co., the receipts for payments were given to it, as stated, and substantially all the correspondence was with that company, and September 9,

1902, in calling for payment for lumber delivered and more prompt taking of lumber, the Dunton Lumber Company said to Kelley & Co.:

"We should like to load these boards up as soon as possible because we are crowded for yard room. If there is any way you could move them a little faster we should like to have you do so."

September 12, 1902, Kelley & Co. replied:

"We have your favor of the 9th inst., and have sent same to Mr. Vanhorn who will attend to the matter,"

and September 15th Vanhorn wrote:

"About taking your lumber. We are ready to move as quickly as it is dry, but we do not propose to take any more of it until it is dry and in good shipping condition. I think in about a month it will be all right, and we expect then to get to work at it again."

October 1, 1902, Vanhorn wrote to the Dunton Company, inclosing check:

"Kelley & Co. wrote me that they want all these matters sent to me as they don't care to bother with them."

October 15th the Dunton Company again wrote Vanhorn urging the taking of the lumber, etc., and in reply Vanhorn said:

"We are now loading a vessel. * * * We expect to come to Rumford Falls. * * * We may be able to get to work," etc.

Again, October 21st, he wrote, and in speaking of the lumber and contract four times stated what "we" are to do or have done or will do. December 19, 1902, the Dunton Lumber Company wrote Vanhorn:

"We hereby forbid your sorting any more pine boards in our yard, as the contract with W. E. Kelley & Co. has not been fulfilled and we have notified them today that the contract is cancelled."

On the same day, December 19, 1902, the Dunton Lumber Company wrote W. E. Kelley & Co.:

"The contract which we had with you for our pine boards is not being fulfilled by Mr. Vanhorn, and we hereby cancel said contract, and no more boards will be shipped on it."

December 20th Vanhorn wrote the lumber company:

"There is still due on your contract of Dec. 11, 1900, little over 500 M ft. pine lumber, which we have not been able to get because the stock was not dry. * * * I reported the facts to W. E. Kelley & Co. and I can't tell what they will do about the matter. I will do this. If you will stop violating the contract and let us have what is due us at the earliest possible moment and according to the contract * * * there will be no trouble, but if you persist in doing as you have been I am in position to compel Kelley & Co. to prosecute you to the limit. What I want is the lumber and I will have it. About the manner of measurement we will hereafter adhere strictly to the contract. Will see you in a few weeks and talk over the business, but in the meanwhile leave the lumber alone and write me what you propose to do."

December 22, 1902, W. E. Kelley & Co. wrote the Dunton Lumber Company and stated that they had the letter of the 19th instant advising them that the contract for boards was not being fulfilled by Mr. Vanhorn, and that for such reason the Dunton Company had canceled it. Kelley & Co. say:

"We wish to advise you that we will not consent to any such thing. Ever since the contract was made with you you have failed to carry out your part of it, and as a consequence we have suffered great damages which up to the present time we have waived, but we advise you now that we will expect you to fulfill the contract to the letter, and we consider it pretty small business in you now to find fault with Mr. Vanhorn for not moving the lumber quite as fast as it should have been moved when you are more than a year behind in the furnishing of the stock. We have referred this matter to Mr. Vanhorn, but as far as we are concerned we will not consent to your action, unless it meets with Mr. Vanhorn's approval."

December 24, 1902, the Dunton Lumber Company wrote Vanhorn:

"I was not aware that you owned any lumber in our mill yard, or had any contract with us, and I would like to have you explain by what authority you forbid us shipping lumber which we own. So far as the contract with Kelley is concerned, their side of it has been violated, and as I wrote you a few days ago, I notified them that the contract was cancelled."

December 26, 1902, the Dunton Company wrote Kelley & Co., in which that company speaks of Vanhorn as an agent merely, and of his alleged misconduct, and calling the attention of Kelley & Co. to their obligations under the contract, and demanding payment for arrearages due. The Dunton Lumber Company then says:

"As far as the damage to you is concerned, by not shipping lumber in 1901, we think you have quite a difficult task to show a jury where the damage came in, when the lumber is worth this year about $3.00 per thousand more than it was last. We shall deal in this matter directly with you, as we do not recognize Mr. Vanhorn's right to any of our lumber, as we have no trade with him whatever, and notified him so in the first place, and none of the lumber which we have shipped, has ever been charged to him and all invoices are made to W. E. Kelley & Co."

December 30, 1902, Kelley & Co. replied to this letter and said:

"We have your favor of the 26th instant in reference to the balance of lumber due on the contract made some time ago with our representatives. It is a matter of great regret to us that any disagreement or unpleasantness should have arisen out of this deal. We have asked Mr. Vanhorn to see you as soon as he can and come to some understanding. * * * You will agree with us that we have never attempted to force a claim for damages on account of your failure to deliver the lumber in the time contracted, although it must be apparent to you that we were much inconvenienced because you could not furnish the lumber to us at the time you expected to be able to do so when you entered into the contract. We gather from Mr. Vanhorn's correspondence that it has been somewhat difficult to ascertain from your men in charge a time when any part of the stock would be fit for shipment. Mr. Vanhorn assures us that he has gone several times to ship out the lumber, expecting to find it dry enough to ship, although we believe that some shipments have been made, and an excess rate of freight paid, because the lumber was not dry."

Then comes this very significant language:

"The failure on your part to give us the lumber in time may have made it impossible, or inconvenient at least, for us to strictly live up to the letter of the contract. We have always understood you were very fair people, and inclined to give and take. There has never been any wish on the part of this office that any advantage should be taken of you. We simply want what you contracted to give us, and you ought to have the conditions complied with as regards our part of the agreement. We believe that if a sense of fairness dwells in the minds of Mr. Vanhorn and yourself, this can be adjusted without any litigation. It seems foolish that fairminded people should talk of litigation. We regret that the distance is so great from Chicago that it makes it impossible for Mr. Kelley or the writer to have a personal interview with you."

151 F.—33

January 3, 1903, the Dunton Lumber Company answered, and said, among other things:

"We have shipped lumber out whenever your representatives have asked us to, and shipped until they told us to stop. We have never had any trouble or friction with any representatives you have sent here, until Mr. Vanhorn took charge of the matter. * * * As we stated to you in our last letter, there is piled in our yard at the present time, which Mr. Vanhorn sorted out about a month ago, some three hundred thousand or more of the pine boards, which are thoroughly well air dried, and which I think Mr. Vanhorn said, were plenty dry enough to ship. * * * Now, if you are in such a hurry for these boards, or if he is, why does he not ship them out? * * * Now, if you are willing to send any fair minded man here to represent you, to take this lumber out, we shall only be too glad to do all we can to assist him, but Mr. Vanhorn will not sort out any more lumber in our yard, that we want distinctly understood, because, if he attempts to do so, we shall stop him. * * * Now, if you are in communication with Mr. Vanhorn, we think it would be better for you, for him, and for us, if you sent him to some other place, and sent some other representative to finish up here, because after the letter we received from Mr. Vanhorn we cannot treat him with the cordiality and respect which we are always desirous of extending to men with whom we do business."

January 7, 1903, Kelley & Co. wrote the Dunton Lumber Company in reply:

"We regret that there should have been anything in the shipment of this lumber to cause you annoyance or inconvenience. We have today written Mr. Vanhorn to endeavor, in closing up this matter with you, to be as considerate as possible, and to try to finish the contract in a manner perfectly agreeable to all concerned."

January 17th Vanhorn wrote the Dunton Lumber Company that he would be in Rumford Falls on the 20th, and would like to see Mr. Dunton and talk matters over.

February 11, 1903, the Dunton Lumber Company wrote W. E. Kelley & Co. that Vanhorn had been there, and stated that he had come to ship out more boards. The language is: "Your Mr. Vanhorn came here today," etc. Later in the letter the Dunton Company says:

"When this bill is settled, if you have a man you can send here to represent you who can treat people with common courtesy and fairness, we shall be ready to meet you half way and see if we can do business. Now, what we desire to know is, whether or not Mr. Vanhorn was acting under orders from W. E. Kelley & Co., when he was here today? * * * We wish to remind you again, that we do not, and never have, recognized Mr. Vanhorn as anything except your representative here. We have never sold Mr. Vanhorn any lumber, we have never charged any lumber to him, have never looked to him for the pay for any lumber, and we would not, because we do not consider him responsible. We look to W. E. Kelley & Co., for the payment of this bill, and we want to know what you are going to do about it, and then we shall know what we are going to do."

February 14, 1903, Kelley & Co. answered, saying, among other things:

"Our Mr. Daugharty is in the East at the present time, and he is the only one of our company thoroughly conversant with the Vanhorn matter, as he made the arrangement with Mr. Vanhorn for the handling of the stock. You may rest assured that we will do nothing but what is right towards you, and will have Mr. Daugharty take the matter up with you immediately on his return, which will be the latter part of next week."

Again, February 24th, Kelley & Co. wrote the Dunton Lumber Company among other things:

"We regret, as we have expressed before, that there should be any unpleasantness between yourselves and our representative, Mr. Vanhorn. Mr. Vanhorn is the only representative we have in the East, and with him we shall be obliged to ask you to deal. Mr. Vanhorn has informed us that he has been unable to secure from you any satisfactory promise, for the past few months, as to when you would definitely agree to give him the stock due us under our contract."

The letter then refers to the transactions between them, and compliments the Dunton Lumber Company on its high credit and integrity, and then says:

"And again ask that you now state when you will furnish the balance of the stock to our representative. When you do we will see that the balance of the money due you is paid."

March 3, 1903, the Dunton Lumber Company replied, reiterating its position that it would have nothing further to do with Vanhorn. March 7, 1903, W. E. Kelley & Co. wrote the Dunton Lumber Company, referring to the letters above referred to of August 7 and August 9, 1902, and suggesting that Mr. Vanhorn be seen and some arrangement made, and the Kelley Company says:

"We instructed Mr. Vanhorn some time ago to not pay you any money until he had received some assurances from you that the balance of the lumber due us under the contract would be forthcoming at a stated time that could be depended on."

March 21, Kelley & Co. again wrote the Dunton Lumber Company, in which they said, among other things:

"We wonder that any company should take the stand that you do—of trying to evade your contract. We have a contract with you under date of the 11th day of December, 1900, whereby you agreed to furnish us a specific amount of lumber during the year 1901. When we made this contract with you we had a planing mill and office at Portland, Maine, and it was through this office that we expected to market the lumber."

The letter then refers to a failure to perform, and to the fact that the Kelley Company closed its Portland office and moved its machinery away, and then says:

"And in your letter to us of August 7th, 1902, you stated you were perfectly willing that Mr. Vanhorn should ship out the lumber as our agent. This you now decline to do. We hold that you have no right to nominate the party with whom you will or will not do business as our representative, and we now say to you that we will hold you for any damages that may arise, or have arisen from the fact of your not having furnished this lumber to us in the time in which you agreed to furnish it. On Thursday of this week I saw Mr. Vanhorn at Albany, N. Y., and he showed me correspondence, and told me of interviews he had with you, and we believe he has conducted himself as a thorough business gentleman. More than this—he has been very considerate, in view of the great inconvenience and expense which we have been put to because of your non-fulfillment of contract. * * * The writer suggested to Mr. Vanhorn that he see you and endeavor to come to a satisfactory understanding. We are prepared to pay you the money we hold in our hands when we have some positive assurance from you that you will fill the contract within a certain time. We are not satisfied with the indefinite manner in which you have furnished us lumber. You have not, as you say in yours of the 16th instant, always furnished us lumber when we requested it. You refused to allow Mr. Vanhorn to ship out some lumber very recently, when he had orders in his hands, and he was therefore obliged to make other arrangements which were expensive, and you may yet have to pay for same. * * * We state

again: All we want is that you shall fill your contract with us, and we will do the same with you, and if you refuse to do it you may as well understand first as last, that we will endeavor to make you pay damages, as well as fill the contract."

(4) After the Dunton Lumber Company wrote that they canceled the contract, and after Kelley & Co. in reply stated that they would not assent to its cancellation, deliveries of lumber were made and accepted, and all the parties, including Vanhorn, treated the contract as in force, and in fact ignored the declaration that it was canceled. As a legal proposition, therefore, the contract was not canceled.

(5) The evidence shows that up to the 10th of January, 1903, when the last delivery of lumber under the contract was made, or, more properly speaking, up to the latter part of December, 1902, the parties did not require strict performance. At times the Dunton Lumber Company failed to have lumber on hand sufficiently dry when it was called for, but this was overlooked, and no advantage was taken of the fact. On the other hand, invoices were furnished which showed the amounts due for various shipments of lumber, and W. E. Kelley & Co. did not comply with the contract by making payments therefor within 10 days, but no advantage was taken of this, and hence, as a legal proposition, I am satisfied that the evidence shows that all defaults in delivery of lumber and all defaults in payment at the dates specified were waived by the parties by their mutual course of dealing, excepting only payment for the delivery of lumber made on or about January 10, 1903. That was the last delivery made, and payment for this lumber was due within 10 days thereafter. Matters were then strained, and each party, as it had the right, was insisting upon strict performance.

In February, Vanhorn called for more lumber, or went to the defendant's place of business for the purpose, as he said, of obtaining further shipments of lumber. The defendant company then stated that it would deliver no more lumber until payment had been made for the lumber delivered prior to that time and not paid for. This demand included, of course, payment for the delivery of January 10, 1903. The defendant company had the right, as a condition of delivering more lumber, to exact payment for that delivery. It had no right to demand and exact payment for the prior shipments as a condition of delivering more lumber under the contract. Strict performance in payments as to such prior deliveries had been waived, but nothing had been said or done that waived payment according to the terms of the contract for the delivery of lumber made January 10th. If Vanhorn or W. E. Kelley & Co. desired more lumber under the contract, it was the duty of the person entitled to such lumber to make payment for or tender payment for the delivery of January 10th, and until that was done the defendant company had the right to refuse to deliver more lumber under the contract. There is no evidence in this case which shows or tends to show that payment for the delivery of January 10, 1903, was either waived or extended, and W. E. Kelley & Co. were in default, and Vanhorn, if he owned the contract and was entitled to performance under it, was in default in that it or he did not pay or tender payment for the January 10th delivery. As all defaults in delivery prior to that date had been waived, the plaintiff's assignor, Vanhorn, in this action

in no event could maintain it, for he himself was in default. Of course, his assignee cannot maintain the action, as his rights are no greater than those of Vanhorn.

But there are other reasons why this plaintiff, the mere assignee of Vanhorn, cannot maintain this action. From the correspondence cited, and which is sustained by the other evidence in the case, it is evident that while W. E. Kelley & Co. made the assignment of the contract to Vanhorn dated June 19, 1902, and which the Dunton Lumber Company refused to recognize, that on such refusal being communicated to W. E. Kelley & Co. and to Vanhorn the parties thereafter treated the contract as one subsisting between W. E. Kelley & Co. and the Dunton Lumber Company and as the property or property right of W. E. Kelley & Co., and that Vanhorn himself acquiesced in this and thereafter operated and did what he did do as the agent and representative of W. E. Kelley & Co. That is, the assignment to Vanhorn was treated as a nullity.

Again, there was no breach of this contract resulting in such damage to Vanhorn or to W. E. Kelley & Co. as was found by the jury, unless it is to be regarded as a contract for the delivery of at least 2,000,000 feet of lumber absolute. I do not think this contract can be so construed or treated. I do not think there is any ambiguity in the contract on this subject which permits the introduction of evidence as to its meaning. It is a contract for the delivery on the terms and conditions named of the entire cut of white pine lumber for the year 1901, except such lumber as the party of the second part shall have to use for his retail trade in the city of Rumford Falls. Here there is no indication as to what the entire cut of white pine lumber for the year 1901 is to be, but later on, in substance, it is agreed that the amount of the year's cut for 1901 shall be at least 2,000,000 feet. There is no suggestion of possible interpretation that the cut for 1901 shall be 2,000,000 feet at least over and above what the Dunton Lumber Company shall have to use for its retail trade in the city of Rumford Falls. The evidence in the case is uncontradicted that there was no default in the delivery of lumber under this contract that would sustain the verdict, unless there was an absolute agreement that the cut of 1901 should be 2,000,000 feet over and above what the Dunton Lumber Company required for its retail trade mentioned. It is true that in one of the letters in evidence the defendant company stated, in substance, that a certain amount of lumber was due under the contract, but in a subsequent letter it stated, in substance, that it had looked the matter up and found that the contract had been fully complied with in respect to the delivery of lumber. This correction was made before the plaintiff's assignor or Kelley & Co. had done anything whatever to change their position. It was a mere error in statement promptly corrected, and which the party making it had the right to correct. That statement did not constitute a practical construction of the contract, as no practical construction was necessary or allowable, and the statement did not make a new contract.

Again, Vanhorn could not have maintained an action against the Dunton Lumber Company for a breach of the contract in not delivering lumber, and his assignee, the plaintiff here, cannot. This contract

was not assignable. This contract is not merely to sell so much, or a specified quantity of lumber, and deliver same at a place named, to be paid for on delivery, so that the obligations of the contractee, or buyer, on receiving the lumber at the place designated, are fully met and discharged by payment therefor, in which case the contract would be assignable for the reason it may be performed by any one, but it involves other relations and considerations of a personal nature and of trust and confidence, in a sense, as well as credit.

1. Credit. Delivery is to be on the cars, an invoice made, and the property consigned to such party at such destination as the purchaser may name. Possession and title then passes to the purchaser, and payment may be made at any time within the next 10 days. This means 10 days' credit.

2. The lumber retained and used in the retail trade of the seller is not to be of the best, but not better than the average grade, and here comes in the personal relations and intercourse and trust and confidence necessary to the proper selection of this lumber; the determination of the question as to what lumber may be retained for retail trade.

3. The lumber is to be sawed by the seller in such manner as the buyer may direct from time to time, and here again comes in the personal relations and intercourse and intelligence and integrity incident to and essential for the giving and receiving directions, and the determination of the questions of honest compliance therewith.

4. The first party, the buyer, is to accept lumber shorter than 12-foot (this means some of that length), and some longer than 16-foot, but at the same time it is agreed that the seller will have the logs cut 12, 14, and 16 feet in length respectively, but the shortest lumber is not to be less than 8 feet long. As to the thickness of boards, directions are to be given from time to time. Here are matters to be mutually considered and agreed upon from time to time in executing the contract that bring the parties into close personal intimacy and relationship where mutual and personal confidence and trust is necessarily reposed. In these matters the seller must rely upon the honesty and integrity of the purchaser; here there is liability to disagreements unless there is intelligence, integrity, and confidence. So they are to agree as to the dryness and fitness for shipment of the lumber. It is a self-evident proposition that the ordinary man would not be willing to enter into such close contract obligations and business relations with every other man, or with a person unknown to him, and be compelled to negotiate and agree or attempt to agree with such person on such matters, or submit to his dictation or decision as to the sawing of millions of feet of lumber, etc. The parties to such an agreement would necessarily confide in the intelligence, experience, and probity of each other in making the agreement, and, unless the character was satisfactory, would refuse to enter into such an agreement. No man is obligated to have such close business relations and involved contract relations with another forced upon him. In such a matter or such matters a contractor has the right to choose the persons with whom he will contract and with whom he is to act and attempt to agree.

The case is squarely within the following authorities: Arkansas Co. v. Belden, 127 U. S. 379, 387, 388, 8 Sup. Ct. 1308, 32 L. Ed.

246; Delaware County Commissioners v. Diebold, etc., Co., 133 U. S. 473, 488, 10 Sup. Ct. 399, 33 L. Ed. 674; Winchester v. Davis Pyrites Co., 67 Fed. 45, 14 C. C. A. 300; Snow v. Nelson (C. C.) 113 Fed. 353–358; Wald's Pollock on Contracts (3d Ed., by Williston) 594, 595; 3 Page on Contracts, p. 1940, § 1262.

And in the following New York cases the principle is clearly stated and fully recognized: Devlin v. Mayor, 63 N. Y. 8; New England Iron Co. v. Gilbert, etc., Co., 91 N. Y. 153, 167; R. L. Co. v. S. & P. P. Co., 135 N. Y. 209, 216, 31 N. E. 1018; Vandegrift v. Cowles E. Co., 161 N. Y. 435, 444, 55 N. E. 941, 48 L. R. A. 685.

In Arkansas, etc., Co. v. Belden Mining Co., 127 U. S. 379, 8 Sup. Ct. 1308, 32 L. Ed. 246, the defendant agreed to sell and deliver to Billing & Eilers at a place named certain ores from its mines, to be delivered at the rate of at least 50 tons per day, and it was provided that "all ore so delivered shall at once upon delivery thereof become the property of the second party," Billing & Eilers. The value of the ore and the price to be paid therefor was to be fixed in lots of about 100 tons each. It was to be sampled when delivered, and the sample assayed by both or one of the parties, and the value fixed by such assay. If the parties did not agree they were to fix on some third party whose assay was to be final. The price to be paid was to be on a basis thereafter agreed on. There was also a partial basis specified for fixing the price. There, as in the case now under consideration, credit was to be given, and there, as in the case at bar, the parties were necessarily to be brought into personal contact and relations; there, in the assay and determination of quality and value; here, in fixing quality, kinds, and lengths, etc. This was the only relation of trust and confidence. Thereafter Billing, the surviving partner of Billing & Eilers, assigned the contract to the plaintiff, and, as defendant refused to deliver ore to it, it sued for damages for such nondelivery or refusal to deliver. Substantially the case is on "all fours" with the one at bar. The court, per Justice Gray, no dissent, held:

"At the present day, no doubt, an agreement to pay money, or to deliver goods, may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterwards done by him, or by some other stipulation, which manifests the intention of the parties that it shall not be assignable.

"But every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of Lord Denman, 'You have the right to the benefit you anticipate from the character, credit, and substance of the party with whom you contract.' Humble v. Hunter, 12 Q. B. 310, 317; Winchester v. Howard, 97 Mass. 303, 305, 93 Am. Dec. 93; Boston Ice Co. v. Potter, 123 Mass. 28, 25 Am. Rep. 9; King v. Batterson, 13 R. I. 117, 120, 43 Am. Rep. 13; Lansden v. McCarthy, 45 Mo. 106. The rule upon this subject, as applicable to the case at bar, is well expressed in a recent English treatise. 'Rights arising out of contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided.' Pollock on Contracts (4th Ed.) 425.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"In short, the plaintiff undertakes to step into the shoes of Billing, and to substitute its liability for his. The defendant had a perfect right to decline

to assent to his, and to refuse to recognize a party, with whom it had never contracted, as entitled to demand further deliveries of ore."

This case has been frequently cited and approved. Delaware Co. Com'rs v. Diebold, etc., Co., 133 U. S. 473-488, 10 Sup. Ct. 399, 33 L. Ed. 674; American, etc., Co. v. Continental Co., 188 U. S. 107, 23 Sup. Ct. 265, 47 L. Ed. 404; Colton v. Raymond, 114 Fed. 869, 52 C. C. A. 382; American B. & T. Co. v. B. & O. S. W. R. Co., 124 Fed. 873, 60 C. C. A. 52.

In Delaware County, etc., v. Diebold, etc., Co., 133 U. S., at page 488, 10 Sup. Ct., at page 404 (33 L. Ed. 674), the court said:

"A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract which manifests the intention of the parties to it that it shall not be assignable. But when rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract. Arkansas Co. v. Belden Co., 127 U. S. 379, 387, 388, 8 Sup. Ct. 1308, 32 L. Ed. 246. And the fact that that party is or represents a municipal corporation may have a bearing upon the question whether the contract is assignable, in whole or in part, without its assent."

In Wald's Pollock on Contracts (3d Williston Ed.) at page 594, the rule is stated thus:

"Again, rights arising out of a contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided."

In 3 Page on Contracts, at page 1940, § 1262, it is stated:

"If A. makes a contract with B. by which he contracts for B.'s personal skill or labor, or reposes special trust in B., B. cannot assign such contract without A.'s consent so long as it is executory on his part."

In Devlin v. The Mayor, 63 N. Y. 8, the court held:

"Where an executory contract is not necessarily personal in its character, and can, consistent with the rights and interests of the adverse party, be fairly and sufficiently executed as well by an assignee as by the original contractor, and where the latter has not disqualified himself from a performance of the contract, it is assignable."

In N. E. Iron Co. v. G. El. R. R. Co., 91 N. Y. at page 167, the court said:

"The matter of the contract involved no personal relation or confidence between the parties, or exercise of personal skill or science, for the contractor was a corporation and its work was necessarily to be done through agents or servants."

In R. L. Co. v. S. & P. P. Co., 135 N. Y. at pages 216, 217, 31 N. E. at page 1021, the court said:

"The contract was not purely personal in the sense that Kelly was bound to perform in person, as his only obligation was to pay for the dies when delivered, and that obligation could be discharged by any one."

In Vandergrift v. Cowles E. Co., 161 N. Y., at page 444, 55 N. E., at page 944, 48 L. R. A. 685, the court said:

"Where the subject of the contract involves no personal relation or confidence between the parties, or the exercise of personal skill or science, and there are no words restraining its assignment, the mere assignment by one of the parties will not operate as a rescission or termination of the agreement."

But here the very terms of the contract, as in Arkansas Co. v. Belden etc., Co., supra, do involve personal relations in its execution, and also confidence in the ability and integrity of the buyer. Hence it was not assignable without the assent of the Dunton Lumber Company, and not only was that assent not given, but it was expressly refused, and the refusal was persisted in and openly announced to both W. E. Kelley & Co. and Vanhorn. But more, the evidence is conclusive that both W. E. Kelley & Co. and Vanhorn accepted the situation and treated the agreement as in full force and a subsisting contract between W. E. Kelley & Co. and the Dunton Lumber Company only, and all that was done was between them, Vanhorn merely representing W. E. Kelley & Co. in the transactions. If there was a final violation of the contract by the defendant, the Dunton Lumber Company, in refusing to deliver lumber when demanded in February, 1903, and a cause of action arose in favor of W. E. Kelley & Co., quite likely that cause of action was assignable, but no such claim was ever assigned to either Vanhorn or the plaintiff, Demarest. Demarest sues as assignee of Vanhorn, who in turn claims that he, as assignee and owner of the contract, and therefore entitled to demand, require, and enforce performance thereof, sustained damages because of the refusal by defendant to deliver the lumber to him. This claim is unfounded and cannot be sustained.

Mention should be made of the letters of October 26, 1901, and October 29, 1901. W. E. Kelley & Co. wrote the Dunton Lumber Company that they had sold 2,000,000 feet of their cut, two cargoes to be shipped that fall, and the balance to be put in pile before the 1st of March, and to be shipped before July 1, 1902. Defendant company acknowledged the receipt of this communication, and stated that it was satisfactory. This correspondence took place before it was ascertained or known what the cut of 1901 would in fact be, or what the amount required for defendant's retail trade would be, and cannot properly be regarded as a practical construction of the contract. It may well be that both parties anticipated there would be that amount and more. The contract is not referred to. What the effect of this would have been had W. E. Kelley & Co. in fact sold that amount of lumber relying on the reply letter as an acceptance and agreement to deliver we need not consider, as Kelley & Co. is not here complaining, and that company had not sold that amount of this cut and suffered no damage by reason of the fact that the 1901 cut did not hold up to the amount stated in that letter. By "retail trade" was evidently intended all of the local custom the Dunton Company had or might have in that vicinity for use there. But in my view of the case this question need not be considered, as the other questions passed upon are fatal to the plaintiff's recovery.

The verdict of the jury is set aside and a new trial granted. So ordered.